[L. A. No. 1091.  In Bank.—April 12, 1902.]

CHARLES E. PATTERSON, Appellant, v. JAMES HAN-
LEY, Respondent.

CONTEST OF ELECTION—IDENTIFICATION MARK UPON BALLOTS.—Upon a
contest of election, ballots upon which the legal mark of the cross
is placed opposite the words "No nomination," which mark can
by no possibility serve a legitimate purpose, must be regarded as
having a distinguishing mark identifying the ballots, and must be
rejected.

ID.—DOUBLE BALLOTS UPON CONSTITUTIONAL AMENDMENT.—Ballots upon
which a cross is placed after both "Yes" and "No" in voting
upon a constitutional amendment do not have a distinguishing
mark which renders them totally void.  It only has the effect to
nullify the vote upon such amendment; and the rule is similar
to that applied where crosses are stamped opposite the names of two
or more rival candidates for the same office which are not to be
counted as to that office, but may be valid in other particulars, and
are to be counted as to other offices to which no objection applies.

ID.—OTHER IDENTIFYING MARKS.—Ballots upon which the cross was
stamped twice in one or more voting-squares, or in which a round
hole is burned, or which have a special number written on their
face, contain identifying marks which render them invalid, and must
be rejected.

ID.—NAME WRITTEN UNDER HEAD OF ELECTORS—PRESIDENTIAL ELECTORS
—JUDICIAL NOTICE.—A ballot on which the voter wrote the name
"William McKinley" in the blank column under the title "Presi-
dential Electors," bears a legal mark in a legal place and should
be counted.  The court cannot take judicial notice that there was
no person of that name in the state of California eligible to the
office of presidential elector.

ID.—BILL OF EXCEPTIONS—BALLOTS NOT OBJECTED TO.—Where the bill
of exceptions upon the election contest contains ballots objected to
by the plaintiff and others objected to by the defendant, which are
serially numbered, and contains other ballots to which no objections
are specified, only the ballots specially objected to can be considered
upon appeal.

ID.—BALLOTS OF ASSISTED VOTERS—ABSENCE OF OATH AND AFFIDAVIT.—
Ballots of electors assisted by officers of election without the oath
of any elector that he could not read, or that by reason of physical
disability he was unable to mark his ballot, and without the affidavit
of the officer of election required by law in such cases, are illegal
and must be rejected.

ID.—POLICY OF LAW AS TO SECRECY.—The policy of the law to pre-
serve secrecy of the ballot does not extend to illegal votes cast
without the statutory safeguards of secrecy.

ID.—PRECINCT REGISTERS—MISTAKE OF COUNTY CLERK—OMISSION OF NAMES OF PERSONS VOTING—ILLEGAL BALLOTS.—Notwithstanding the injustice that voters should be deprived of their franchise through the mistake or fault of the county clerk in binding their names in the wrong precinct book, yet, under the statute providing that no persons shall be allowed to vote whose names are not on the precinct register, the votes of such electors, though cast on production of certificates from the clerk showing their regular registration in the precinct of their residence, and that their names were on the great register, are illegal and must be rejected.

ID.—LIST OF ILLEGAL VOTES—WAIVER OF OBJECTION—OFFERS OF PROOF. —Where no objection was made to offers of proof by the plaintiff as to illegal votes cast by the defendant, on the ground that the plaintiff had failed to furnish lists of votes claimed to be illegal, prior to the trial, as provided by section 1116 of the Code of Civil Procedure, the failure to make such objection must be regarded as a waiver of compliance with the statute, or as an admission that it had been complied with; and an objection upon appeal that the ballots were properly refused for want of such lists is too late.

ID.—MISCONDUCT OF ELECTION OFFICERS.—Misconduct of the election officers in not complying with the provisions of the statute for the safeguarding and certifying of the returns and for the integrity of the ballot-boxes, though omitted seemingly through ignorance and without intentional fraud or actual wrong done, renders it a matter of grave doubt whether the ballots cast at the precinct should be counted; but it is sufficient to suggest such doubt where the vote of such precinct is immaterial to the result of the election.

ID.—MODE OF NEW TRIAL.—Upon a new trial ordered as the result of an appeal, the court need not recount ballots to which no objection was made at the first trial, but should take the results of such ballots as then ascertained; and election officers should not be compelled to disclose the contents of ballots of assisted voters.

APPEAL from a judgment of the Superior Court of Los Angeles County. M. T. Allen, Judge.

The facts are stated in the opinion of the court.

Edwin A. Meserve, and George B. Beebe, for Appellant.

Adcock & Reymert, and J. W. McKinley, for Respondent.

BEATTY, C. J.—This is an election contest prosecuted under the provisions of sections 1111 et seq. of the Code of Civil Procedure.

At the general election in the year 1900 appellant and respondent were rival candidates for the office of supervisor

in the fifth district of Los Angeles County. As a result of
the official canvass, respondent was declared elected, and
appellant thereupon filed his contest, based upon various
grounds, requiring a recount of the ballots. During the
recount many of the ballots were objected to by the respect-
ive parties upon the ground that they were void or illegal,
and it is to the rulings of the court sustaining or refusing to
sustain these objections that most of the exceptions appear-
ing in the record were reserved. There were counted and
tallied by the court 4,984 votes, of which 535 were found to be
scattering. Of the remainder, 2,219 were counted for the
appellant and 2,230 were counted for respondent, giving him
a plurality of eleven votes. At the close of the recount, and
of plaintiff's evidence,—which, aside from the ballots, related
mainly to allegations of misconduct of the election officers in
precinct 57B of the city of Los Angeles,—the court, upon
motion of the respondent, ordered a nonsuit, from which the
contestant appeals. In support of his appeal he contends
that many more than eleven illegal ballots were counted for
respondent, and that the votes of precinct 57B, in which,
according to the recount, respondent had a plurality of twenty-
one, should have been wholly rejected on account of the mis-
conduct of the board of election. He also contends that the
trial court erred in refusing his offers to prove that certain
ballots cast by unqualified or disqualified electors were cast
for the respondent.

1. As to the ballots there are two objections urged by appel-
lant, each of which affects a considerable number:—

*a.* Ballots with a cross stamped in the voting square after
the words ''No nomination'';

*b.* Ballots with crosses stamped after both ''Yes'' and
''No'' upon proposed constitutional amendments.

Besides these principal objections, there are various others
of a miscellaneous character.

The form of the official ballot used at this election was
that prescribed by the amendments to the election law of
March 20, 1899. (Stats. 1899, p. 133.) By section 1197 of
the Political Code, as then amended, the various party
tickets are required to be printed on the official ballot,
in parallel columns,—under headings composed of the
party designations,—with a blank column at the right,

containing only the titles of the various offices to be filled at the election, leaving blank spaces underneath in which the voter may write the name of any person whom he may prefer to the candidates whose names are printed on the tickets. Whenever any questions—such as the ratification of proposed constitutional amendments—are to be submitted to a vote of the people, such questions are required to be printed in a separate column to the right of the blank column, and opposite said questions on separate lines the words "Yes" and "No" (the law as printed says "Yes" *or* "No," but this is evidently a mistake), the choice of the voter to be expressed by stamping a cross (X) in the voting-square after the word "Yes," if he is in favor of the amendment, or after the word "No," if he is opposed to its adoption. To the right of each column, except the blank column, a ruled space half an inch wide must be left, and this must be divided by horizontal lines into voting-squares corresponding to the various offices to be filled and questions to be answered. Among other minute and detailed provisions of this section, it is further enacted, that no candidate's name must be printed on the ballot in more than one place, and that if the same person is nominated by more than one party or organization for the same office he must make his election of the ticket he desires his name to appear upon, failing which his name must be placed upon the ticket of the party first certifying his nomination, and upon the ticket of any other party which has nominated him the words "No nomination" must be printed instead of his name; just as the same words must be printed in any party ticket under the title of an office for which such party has actually failed to name a candidate. The regulations prescribed to the voter for the preparation of his ballot, so far as they are material to the present discussion, are as follows: "He shall prepare his ballot by marking a cross after the name of the person or persons for whom he intends to vote or by writing a name or names in the blank column, and in case of a constitutional amendment, or other question submitted to the vote of the people, by marking in the appropriate margin a cross (X) against the answer which he desires to give. Such marking shall be done only with a stamp, which with the necessary pads and ink shall be provided by" the proper officers. (Stats. 1889, p. 139, sec. 1205.)

Section 1211 reads as follows:—

"1. In canvassing the votes any ballot which is not made as provided in this act shall be void, and shall not be counted; but each such ballot must be preserved and returned with the other ballots. Any name written upon a ballot shall be counted for the office under which it is written; *provided,* it is written in the 'blank column.'

"2. If a voter marks more names than there are persons to be elected to an office, or if for any reason it is impossible to determine the voter's choice for any office to be filled, his ballot shall not be counted for such office." (Stats. 1899, p. 140.)

Section 1215 provides, among other things, that "No voter shall place any mark upon his ballot by which it may be afterward identified as the one voted by him." (Stats. 1891, p. 178.)

There is no difference of opinion as to the meaning of these and other provisions of the election law with which they are co-ordinated. It has been held by this court, and by many other courts, as is indeed evident, that the whole design of the statute, in this aspect, is to prevent the intimidation or corruption of electors by defeating its object. It is assumed that there can be no effective bribery or intimidation in the absence of any means of determining whether the elector has voted according to his promise, and that if any mark or indication which will serve to identify the ballot cast by a particular person will at the same time insure its rejection, there will no longer exist any motive for attempting to influence him by threats or promises. The cogency of this reasoning must be conceded, but there are good grounds for doubting whether it can be effectively applied in legislation. Certain it is that no law hitherto enacted has ever provided any effective means of preventing a voter so disposed from putting upon a perfectly legal ballot a mark by which it may be certainly and easily identified. As remarked by Justice Temple, in delivering the opinion of this court in *Jennings v. Brown,* 114 Cal. 307: "The so-called Australian ballot system only secures secrecy of voting when the elector desires it and has sufficient independence to insist upon it. But a voter can, by one who has sufficient power over him, be forced to so mark his ballot that it can be identified. Many ways

could be suggested in which this could be done without destroying the legality of the ballot.'' What was there said of the so-called Australian, or reform, ballot could have been said with equal truth of the ballot which preceded it, or of the reform ballot in its present stage of development. Under every form of ballot of which we have had any experience the voter has been allowed—and it seems to be agreed that he must be allowed—the privilege of casting his vote for any person for any office by writing his name in the proper place. Take the ballot in its present form. What would prevent an elector from writing the name of any other elector, or even his own name, in the blank column, under the title of any office, as might be agreed between him and a person purchasing or coercing his vote? Such a ballot, if otherwise correctly marked, would be perfectly legal, and at the same time would be perfectly identified by the selected name, by its position on the ballot, by the handwriting, and by the vote for the persons in whose behalf it was purchased or coerced. Yet, impotent as the law has always been, and as it seems destined to remain, in its efforts to prevent a voter so disposed from placing upon his ballot a mark which will certainly identify it, the legislature has enacted, and has deliberately retained in every amendment of the law, the mandatory provisions above quoted from sections 1211 and 1215 of the Political Code, and has thus imposed upon the courts the duty of enforcing them according to their terms and their evident intention, regardless of the conviction often forced upon our minds that the marks which have the effect of invalidating ballots are in most instances the result of ignorance and mistake, and not of any plan for the corruption or intimidation of voters.

It may, however, be said in favor of the law, and as justifying its strict enforcement, that such mistakes are always avoidable, that the penalty visited upon them puts a premium upon intelligence and circumspection in the act of voting, and that the necessary tendency of this is to invest the elective franchise with a higher value in popular estimation. It may also be said that honest mistakes in the marking of ballots are likely to occur in uniform proportions in the votes of the different parties, so that, except in very close elections, their impartial treatment in the count will work no change in the result. But however this may be, it has been settled

by the decisions of this state, and of most of the states in which the election laws are framed upon the same model, that the placing of an illegal mark upon a ballot, or a legal mark in an illegal place, renders it void. In *Tebbe* v. *Smith,* 108 Cal. 110,[1] it was held that the letter J written in a blank space on the ballot required the rejection of the ballot. In *Lauer* v. *Estes,* 120 Cal. 654, the same ruling was extended to ballots bearing the stamp-mark in illegal places—one of which was the square opposite a blank space. In *Farnham* v. *Boland,* 134 Cal. 151, this court made an even stricter application of the principle of *Lauer* v. *Estes.* Upon the same principle, we think, it must be held that the trial court erred in counting the ballots of class A, above mentioned, in which the cross was stamped opposite the words "No nomination." This, though a legal mark, was placed where it could by no possibility serve a legitimate purpose, and must therefore be treated as a distinguishing mark.

Our election law seems to have been copied as to the form of the ballot from the New York statute, and in May, 1898, before its adoption here, the case of *People* v. *Board of Canvassers,* 156 N. Y. 36, had been decided, holding, among other things, that a cross placed opposite the words "No nomination" invalidated the ballot. The value of that case as a precedent is, however, to some extent, qualified by the fact that the New York statute expressly declares that it shall be *unlawful* to place the cross anywhere upon the ballot, except in the circle to the left of the candidate's name. Our statute is not direct and explicit to that effect, but, as heretofore construed, sections 1211 and 1215 of the Political Code have the same force as the express provisions of the New York statute.

In this connection it should be stated that there is here no question .of fact, but only one of law. The same evidence is before us that was before the trial court,—viz., the original ballots,—and there is no suggestion in the argument or evidence in the record, that they were or might have been altered or tampered with after leaving the hands of the voters who prepared them. In ruling upon their validity, therefore, we are not weighing evidence, but merely construing a document, the contents of which are undisputed.

[1] 49 Am. St. Rep. 68.

But the trial court did not err in counting the ballots of class B, the sole objection to which was that they bore a cross opposite each of the words "Yes" and "No" on questions of ratifying constitutional amendments. The contention of appellant as to this class of ballots is, that they are void by the express provision of section 1211 of the Political Code, that in canvassing the vote any ballot *which is not made* as in this act provided shall be void. He argues that the law provides for only one cross, after the word "Yes," if the voter desires to ratify, or after the word "No," if he desires to defeat, a proposed amendment, and that if the voter has no choice to express he must not stamp the cross in either place. To stamp in one place or not at all, he contends, is the only permissible course, and, therefore, a ballot with the stamp in both places is not *made* as in the law provided, and is necessarily void. We think this is giving too broad a significance to the clause in question. We agree with counsel for respondent that it was intended to cover simply the form of the ballot and the means of designating thereon the choice of the voter; that is to say, by the use of a stamp instead of a pen or pencil in voting printed names or propositions, and by writing names only in the proper blank spaces when writing became necessary. These requirements as to the *making* of the ballot being complied with, the redundant use of the stamp will not invalidate a ballot unless the cross appears in an illegal place, or is repeated in the same place. Here no cross was stamped in an illegal place. The two crosses served no purpose it is true, but the law was not violated, and we are satisfied, as the trial judge evidently was, that they were not intended as distinguishing marks. They had the same effect as crosses stamped opposite the names of two or more rival candidates for the same office, and they ought to be governed by the same rule,—i. e. the ballots are not to be counted as to the office or the question to which they give an equivocal answer, but in other particulars they are valid. (Pol. Code, sec. 1211; *Day* v. *Dunning,* 127 Cal. 57.)

With regard to the ballots objected to on various grounds, we think the following, which were counted for respondent, should have been rejected. Plaintiff's exhibits 67 and 241 were ballots upon which the cross was stamped twice in one or more voting-squares, rendering them invalid under the decis-

ion in *Farnham* v. *Boland,* 134 Cal. 151. Ballot marked plaintiff's exhibit 55 had a round hole burned in it. Under the stipulation of the parties, and in the absence of any evidence to the contrary, it must be assumed that the ballot was in this condition when it left the hands of the voter, and certainly there could be no surer mark of identification. Ballot marked plaintiff's exhibit 194 had the number 17 written on its face; this was an identifying mark. To these four ballots, incorrectly counted for respondent, must be added twenty-three others upon which the cross was stamped opposite the words "No nomination." These are designated in the record as plaintiff's exhibits 38, 39, 41, 42, 43, 45, 46, 47, 51, 52, 53, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 178, 217.

Deducting these twenty-seven votes from respondent's score, it is reduced to 2,203, leaving appellant a plurality of sixteen votes, to which there should be added one vote on account of a ballot objected to by defendant and thrown out by the court. This was the ballot marked defendant's exhibit 127, objected to upon the ground that the voter had placed a cross after the words "No nomination" where printed in the column of the prohibition ticket, etc. An examination of this ballot shows that it is entirely free from the objection stated. There is a mistake of some sort in the bill of exceptions regarding the exhibit in question, and we must suppose a mistake in the ground of the court's ruling. It is not probable that this particular objection was sustained when interposed by respondent, after it had been several times overruled when made by appellant. The bill of exceptions does, however, show that the ballot in question was not counted for the appellant, as it should have been.

We do not find any other rulings adverse to the appellant, on objections to particular ballots, which can be held erroneous. On plaintiff's exhibit 236 the voter wrote the name "William McKinley" in the blank column under the title "Presidential Electors." The court did not err in counting this ballot. On its face it was free from objection. The court certainly could not take judicial knowledge that there was no person of that name in the state of California eligible to the office of presidential elector. The name as written was a legal mark in a legal place.

From the plurality of seventeen for the appellant, which is established by these corrections, must be deducted five votes on account of ballots marked with two crosses in the same voting-square, and counted for appellant over the objection of respondent, leaving the appellant thus far a plurality of twelve.

Besides the exceptions to ballots set out in full in the printed record, there is a stipulation of counsel making all the original ballots that were objected to a part of the bill of exceptions. These have been returned with the printed transcript to the number of nearly four hundred. They are indorsed on the back ''Plaintiff's Exhibit'' or ''Defendant's Exhibit,'' according as they were objected to by the plaintiff or the defendant, they are serially numbered, and the rulings of the court are indicated by the words ''Objection sustained,'' or ''Objection overruled.'' No specific ground of objection appears either on the ballots or in the record, except those above considered, and a few others by appellant which require no particular notice. As to the remainder,—some three hundred ballots to which the objections are nowhere specified,— we have not examined them and cannot undertake to do so. If we did we should have to raise the objections to them ourselves, and might possibly sustain objections that were never made.

2. The election law contains provisions for the assistance of voters who, by reason of illiteracy or physical disability, are unable to mark their own ballots. These provisions are found in section 1208 of the Political Code, which reads as follows: ''When it appears from the register that any elector has declared under oath, when he registered, that he cannot read, or that by reason of physical disability he is unable to mark his ballot, he shall, upon request, receive the assistance of two of the officers of election, of different political parties, in the marking thereof, to be chosen as follows: one by the inspector then receiving the ballot, and the other by the judge of the opposite political party which at the last election cast the highest number of votes throughout the state, and in the event there are more judges than one of said party, then by the one of said judges who shall be named by said inspector. Neither of the persons appointed shall be of the same political party with the person appointing, nor shall either of said persons

so making said appointments appoint the other for said pur-
poses.   Such officers shall thereafter give no information
regarding the marking of said ballot.   The officers making
such appointments shall make the same in writing and sign
the same, and upon the same paper the persons so appointed
shall subscribe and take the following oath before assisting
such elector:—

"State of California, County of ———, Assembly District
    Number ———, Precinct —, ss.

"——— and ———, being duly sworn, each for himself,
says that he is one of the officers of election appointed to assist
——— [here insert the name of the elector] in marking his
ballot, and that he will not give any information, now or here-
after, regarding the same.

"_____
"_____

"Subscribed and sworn to before me, this ——— day of
———, A. D. 18——.

"Said affidavits may be sworn to before any officer of elec-
tion competent to administer an oath, and the same, with the
indorsements, shall be returned to the county clerk, as pro-
vided in section one thousand two hundred and sixty-one of
this code.

"Lists of the voters who have been assisted in marking their
ballots shall be kept by the clerk keeping the poll-lists, and
shall be returned and preserved, as the poll-lists are returned
and preserved.   As amended March twenty-third, eighteen
hundred and ninety-three."

It was proved at the trial of this contest that a large num-
ber of electors were assisted in the different precincts of the
fifth supervisoral district without any regard to the conditions
prescribed by this section, and that their ballots were counted.
None of them had declared under oath when he registered that
he was illiterate or subject to any physical disability, and as
to some of them it appeared affirmatively that they could read
and write and could have marked their own ballots.   No one
was appointed to assist them, no oath was administered to
them or to the person who marked their ballots, no record was
kept of the matter and no returns made.   These votes were
clearly illegal.   The ballots were not made as in the act pro-

vided, and should not have been placed in the ballot-box. Unless the conditions are observed upon which a voter may be assisted, there is an end to secrecy of the ballot, and all the minute provisions of the existing law having that object are worse than vain. There is, moreover, no excuse—unless ignorance is an excuse—for a failure to observe the law regulating this matter. It was error, therefore, for the trial court to sustain the objection to appellant's offer to prove that these illegal votes were cast for the respondent—at least where the offer was made to prove the fact by the voter himself or by persons other than election officers. Section 1215, of the Political Code (Stats. 1891, p. 178) prohibits all election officers from disclosing to any person the name of any candidate for whom any elector has voted, and perhaps under this section election officers may be privileged to refuse to testify even when they have violated the law in assisting electors, but the voter and other persons are not privileged. The policy of the law is, it is true, to preserve secrecy of the ballot, but this policy does not extend to illegal votes. If the elector disregards the terms upon which he is allowed to vote, and thereby secures the counting of an illegal ballot, he forfeits the privilege of secrecy in favor of the superior right of a party injured by his act to have the truth disclosed.

3. The precinct registers used at the election in 1900 were prepared in accordance with section 1113 of the Political Code as amended in 1899 (Stats. 1899, p. 62), and consisted of the affidavits of the electors bound in precinct books. By mistake of the county clerk, the affidavits of two electors were bound in the wrong precinct book. When they offered to vote in the precincts where they respectively resided their votes were refused at first, but on production of certificates from the clerk showing that they had been regularly registered in their proper precincts, and that their names were on the great register, their ballots were received. Appellant contends that these were illegal votes, and that the trial court erred in rejecting his offer to show that they were cast for respondent. It has been the law of this state ever since the amendment of March 30, 1878, that no person shall be allowed to vote whose name is not on the precinct register. (Pol. Code, sec. 1227, as amended; Stats. 1877-1878, p. 26.) It is most unjust that a voter should be deprived of his franchise through the fault

of an official; but if this provision is valid, it would seem that the omission of a name from a precinct register is fatal. So far as we can discover, no substitute for the register or means of supplying its defects has been provided by the law, which, as above quoted, simply declares that no person shall be allowed to vote unless his name appears upon the precinct register.

We have not overlooked the point made by respondent that appellant's offers of proof as to these illegal votes were properly refused upon the ground that he had failed to furnish lists of votes claimed to be illegal prior to the trial, as provided by section 1116 of the Code of Civil Procedure. We think, however, that this objection comes too late. It was not made when the proof was offered, and the failure to make it then was an admission that the statute has been complied with, or was at least a waiver of compliance.

4. The allegations of misconduct on the part of the election officers of precinct 57B cover a number of particulars, and as to most of the charges are sustained by the evidence. But the trial judge was satisfied, and the evidence sustains his conclusion, that no fraud was intended or actual wrong done. Various provisions of the statute looking to the safe-guarding of the returns and the integrity of the ballot-boxes were neglected, seemingly through ignorance, and the returns were not properly made up or certified. It is not necessary, however, to go into the particulars of these objections, because it can make no change in the result whether the vote of this precinct is counted or not. With it or without it the appellant has a clear plurality of the legal votes cast in the district, and it is sufficient to say that in view of the previous rulings of this court,—especially in *Tebbe* v. *Smith,* 108 Cal. 110,[1]— it is a matter of grave doubt whether the ballots from precinct 57B should have been counted.

It follows from what has been said that the judgment of the superior court must be reversed; but the question remains whether the cause should be remanded for further proceedings or with directions to enter a final judgment for the appellant. My own opinion is, as expressed in dissenting from the order of the court refusing to modify the judgment in *Farnham* v. *Boland,* 134 Cal. 155, that in this class of cases, where the

[1] 49 Am. St. Rep. 68.

proper practice is to bring up all the exceptions on both sides, and where we have before us, in its original form, all the evidence essential to a final determination of the controversy, and where the ends of justice require it, that our judgment ought to be final; but in view of the decision of the court in the case referred to this cause must be remanded for further proceedings. It does not seem, however, that the superior court should be put to the unnecessary trouble of recounting the ballots which were not objected to on the first trial.

The judgment of the superior court is reversed and the cause remanded for a new trial. Upon such new trial the court may omit a recount of the ballots to which no objection was made at the first trial, taking the results as then ascertained, so far as said ballots are concerned. The ballots of precinct 57B are to be counted so far as necessary, and election officers are not to be compelled to disclose the contents of ballots of assisted voters.

Van Dyke, J., and Henshaw, J., concurred.

McFARLAND, J., concurring.—I concur in the judgment of reversal, and in all the conclusions as to the points involved. I also concur in the opinion of the chief justice, except as hereinafter indicated.

I would not wish to be understood as concurring in that part of said opinion which might be construed as a commendation of or an apology for our present complex imported election law.

I agree that the crosses stamped after both "Yes" and "No" upon proposed constitutional amendments did not invalidate the whole ticket; because, under the provisions of the law, the only effect was that the vote on the amendment could not be counted. But I do not think that either the court below or this court can say that the crosses were "not intended" as distinguishing marks. The question as to a distinguishing mark always is whether or not the mark is, in fact and law, one which distinguishes the ballot from other ballots; not whether the voter so intended. It is usually impossible to tell what the voter actually intended.

No doubt there might be an appeal in an election case in which it would be proper for this court to order final judg-

ment without doing injustice to either party; but it is apparent that, under the record in the case at bar, such judgment would be entirely unwarranted.

HARRISON, J., concurring.—I concur in the opinion of the chief justice upon the validity of the ballots therein discussed by him.  It would without question be proper for this court to make a final determination of an election contest when the record before it is such that the rights of the respective parties can be properly preserved, but it clearly appears from the record herein that the rights of the respondent cannot be determined upon this appeal, and, consequently, that he should be permitted to present a record from which his rights can be ascertained.  For this reason I concur in remanding the cause as directed at the close of the opinion of the chief justice.

Temple, J., and Garoutte, J., concurred with Harrison, J.

Rehearing denied.