[Civ. No. 41472. Second Dist., Div. Two. Dec. 21, 1973.]

MICHIGAN NATIONAL BANK, Plaintiff and Respondent, v. HARDMAN AEROSPACE, Defendant and Appellant.

198

**COUNSEL**

Gibson, Dunn & Crutcher, John L. Endicott, Breed, Abbott & Morgan, Edward J. Ross and James D. Zirin for Defendant and Appellant.

Irsfeld, Irsfeld & Younger, John H. Brink, James J. Waldorf, Rosenman, Colin, Kaye, Petschek, Freund & Emil, Max Freund, Robert W. Gottlieb and James K. Nevling, Jr., for Plaintiff and Respondent.

**OPINION**

**ROTH, P. J.**—Appellant, Hardman Aerospace, a California corporation (Hardman), appeals from a judgment awarding respondent, Michigan National Bank, a National Banking Association (Bank), a judgment of $3.2 million.

This lawsuit is grounded on a contract dated October 30, 1969, amended severally on December 4 and December 15, 1969, and executed on December 15, 1969 (Sale Contract), whereby Dayco Corporation, a Delaware Corporation (Dayco), is named as Seller, Chatillon Corporation,[1] a California Corporation (Chatillon) is named as buyer and Macrodyne-Chatillon Corporation, a New York Corporation (Macrodyne) is named as guarantor.

 Since we find that the trial court erred in interpreting Sale Contract we vacate the judgment with directions.

---

[1]The parties disregard Chatillon in their briefs and treat Macrodyne as Buyer. They also concede that Chatillon was and is a wholly owned subsidiary of Macrodyne, *formed for the sole purpose of operating Hardman.* When we speak of Macrodyne, Chatillon is included unless specifically referred to.

## FACTS

Dayco, by Sale Contract, sold all the outstanding shares of its wholly owned subsidiary, Hardman, to Chatillon, for approximately $9 million, $6,200,000 in cash and $2,750,000 deferred. The deferred payment was to be made in increasing annual installments commencing December 15, 1970, with a final balloon payment due upon the expiration of five years (deferred payment). The deferred payment was evidenced by a promissory note (Note)[2] payable to the order of Dayco, made for reasons which will appear, not by Chatillon, the named buyer, but by Hardman (the thing sold) and guaranteed by Macrodyne.

On July 31, 1970, or prior thereto, G. F. Fleicher, who had represented Dayco in negotiating Sale Contract, called Morton Mailman, chairman of Macrodyne, who had represented Macrodyne to offer Note to Macrodyne for purchase at discount of 10 to 15 percent. Mailman replied that Macrodyne did not have the cash and "mentioned a possible future inventory claim by Macrodyne . . . ." Fleicher stated he intended to discount Note to a bank or other institution. Mailman registered an objection. The Fleicher offer to Mailman was followed by a series of negotiations which apparently had been commenced in June 1970 between Dayco and Macrodyne to effect a settlement of misrepresentations and legal infirmities previously asserted by Macrodyne in respect of Sale Contract. These negotiations included the taking of depositions and continued to no avail until approximately December 7, 1970, on which date they were broken off by Dayco.

During the above negotiations, without the knowledge of or notice to Macrodyne or Hardman, Dayco, on or about August 9, 1970, allegedly sold Note to Bank.

On December 16, 1970, Macrodyne, alleging the legal infirmities and material misrepresentations in Sale Contract, and other conduct equating with fraud, which had been discussed in the prior conversations with Dayco, filed an action in the federal court in New York against Dayco

---

[2]In pertinent part Note required payment of installments of principal and interest on anniversary dates as follows:
1) $100,000
2) $150,000
3) $450,000
4) $550,000
5) Balance: "Interest shall be computed by taking the average prime rate as charged by the Bank of America National Trust and Savings Association in the Southern California area, during the annual period for which such interest is being paid."

and Ernst and Ernst, its accountant, for rescission of Sale Contract or damages and punitive damages.

Bank, by letter dated and presumably mailed on December 9, 1970, advised Hardman it was owner of Note and made demand on Hardman for the first installment and interest due on Note according to its terms on December 15, 1970. The notice transmitted by regular mail from Michigan did not reach Hardman in Los Angeles until December 14. It was the first information to Hardman or Macrodyne that Note was purportedly owned by Bank. Macrodyne immediately called Dayco. The December 15th installment, $100,000 plus interest, was not paid. Bank thereupon accelerated the balance and demanded full payment of $2,750,000 plus interest. It was not paid. The next day, December 16, 1970, a few hours after Macrodyne had filed its rescission action in New York, Bank filed the action at bench against Hardman and attached its assets.

Hardman answered and pleaded affirmative defenses, all of which alleged infirmities inherent in and misrepresentations which induced the execution of Sale Contract previously asserted by Macrodyne in the negotiations between Fleicher and Mailman. In the protracted and involved proceedings at bench which followed, Dayco took the position that such defenses could not be raised by Hardman, that it was not a party to Sale Contract and that such defenses could be raised only by Macrodyne. The record is saturated with efforts to persuade the court to disregard form and look to substance, as developed by the evidence (*infra*) but the trial court determined that Hardman was at all times a separate corporate entity; Note was Hardman's obligation and that since the action was not against Macrodyne on its guaranty, no defenses which might be available to the Sale Contract signatories were available to Hardman.

In pertinent part the court found:

"9. Pursuant to the Agreement as amended, the transaction was consummated on December 15, 1969. On this date, the Note was executed by Hardman and delivered to Dayco. On the same date, Macrodyne caused payment of $5,700,000 of cash funds to Dayco (making a total cash payment to Dayco of $6,200,000)[3] as required by the Agreement and also delivered to Dayco its guarantee of payment of the Note by Hardman.

"10. The Note was issued at the time of and as a part of the sale transaction, *but was not part of the consideration* for the sale of the stock and *the sole consideration* for the Note was the prior existing indebtedness

---

[3]The record shows $500,000 in cash had been previously or currently paid.

from Hardman to Dayco. The guaranty of the Note by Macrodyne was given as part of the consideration for the sale transaction but the instant suit seeks no relief under the guaranty." (Italics added.)

Finding 11 recites: "11. The purchase price for the Hardman stock was $6,000,000 plus the guaranty by Macrodyne of the Note."

A judgment representing the principal amount of Note in the sum of $2,750,000 plus costs and attorneys' fees was rendered against Hardman and in favor of Bank in the total sum of $3,197,501.65.

### The Transaction Between Macrodyne and Dayco

Since it is our opinion that findings 9, 10 and 11 misconceive and contradict the intention of the parties as expressed in Sale Contract and emphasized by the undisputed evidence, it becomes important to analyze the transaction between Dayco and Macrodyne.

Nine million, not six million dollars, contrary to finding 11, was in fact the purchase price. This purchase price of $9 million is verified by Sale Contract and other undisputed evidence and capsulized in pertinent part by Dayco's admission in its 65th Annual Report dated January 21, 1971, wherein it states it ". . . received 6 million in cash and an installment note . . . for $2,750,000 million" (discussed *infra*).

The purchase price of Hardman having been fixed at $9 million by negotiations prior to execution of Sale Contract ($12 million was the original asking price), the manner of payment remained for negotiation. Macrodyne could't pay all cash nor was it demanded. Dayco had acquired Hardman for approximately $48,000 and the purchase price having been agreed upon as $9 million, Dayco had business and tax questions to solve, the solution of which would be affected by the manner in which cash was paid and/or deferred payments were made. In the years following its acquisition, Dayco made substantial periodic advances to Hardman. Whether such advances were to be treated as loans or contributions to capital, were of tax importance to Dayco, and Dayco was also faced with a pending question as to whether a substantial cash dividend should be declared by Hardman payable to it. Prior to consummation of Sale Contract, Ernst & Ernst, accountant for Dayco, advised Dayco that certain advances should be considered as loans and also how a dividend should be paid. The extent of the advances which could have been treated as loans or capital contributions approximated $3 million. Part of the $6,200,000 paid by Macrodyne was used to repay the portion of the $3 million that were classified as loans. The questions of

taxes and how a dividend was to be declared were problems and the manner in which the deferred payment represented by Note in an approximate amount of $3 million was to be paid were an important part of the consideration to Dayco and were discussed at length and in detail by Dayco and Macrodyne. On October 10, 1969, five weeks prior to execution of Sale Contract, Ernst & Ernst, accountants for Dayco, wrote to Macrodyne's controller in pertinent part as follows:

"Mr. Harold Cohen, Controller
"Macrodyne Chatillon Corp.
". . . . . . . . . . . . . .

"Dear Mr. Cohen:

"This letter will discuss desired changes in the terms of the proposed acquisition of Hardman by Macrodyne from Dayco. These changes do not appear to effect Macrodyne adversely, however, you will want your accountants to review them.

"The basic change is that Hardman wants to pay to Dayco a substantial dividend just prior to being acquired by Macrodyne. The purchase price for Hardman would be reduced by a similar amount.

"Assuming payment of Dayco advances of $3,500,000, a purchase price of $5,500,000, cash distribution of $6,000,000, and a net worth of Hardman of $2,800,000, the transaction would be as follows:

"1. Hardman declares a dividend of $2,500,000 payable to Dayco, the only stockholder.

"2. Hardman gives Dayco a note for $2,500,000 as payment of the dividend.

"3. Later (say one hour) Macrodyne purchases Hardman from Dayco for $3,000,000 ($5,500,000 less dividend). Dayco receives a check for $3,000,000.

"4. Immediately Macrodyne advances Hardman $3,000,000.

"5. Hardman pays Dayco the $2,500,000 note and $500,000 on the advances. Hardman gives Dayco a note for the remaining $3,000,000 of advances.

". . . . . . . . . . . . . .

"A further possibility is for Dayco to receive a note for the sale of

Hardman stock, Macrodyne advance $6,000,000 to Hardman who would pay the dividend note ($2,500,000) and the advances ($3,500,000) to Dayco. This would increase the amount of advance by Macrodyne to Hardman to $6,000,000 for future withdrawal purposes and allow Dayco an installment sale of the Hardman stock."

The transaction embraced in Sale Contract was completed substantially in accordance with the Ernst & Ernst letter. The deferred payment represented by Note was an inherent part of Sale Contract. It was fully as much a part of the consideration as was the cash paid out by Macrodyne which was paid in substantially equal parts, one part to Dayco directly and one part to Hardman. Substantially in accordance with the Ernst & Ernst letter, a dividend in the amount of $2,750,000 was paid by Hardman to Dayco. Its assets were thus reduced by that amount. The deferred payment due from the named buyer Chatillon which would normally have been in the form of a note from Chatillon guaranteed by Macrodyne, was managed by Dayco and Macrodyne to take the form of Note, so as to give Dayco the most benefit it could receive from the $9 million consideration it expected and received from Macrodyne.

### Assignment of Note to Bank

The record demonstrates that Dayco never effected a bona fide sale or discount of Note with Bank and that Bank in the action at bench, although taking the position that it was a holder in due course for consideration of Note, actually was in all proceedings at bench in connection therewith the agent for Dayco.

The trial court found:

"12. On August 18, 1970, Dayco endorsed the Note to the order of Plaintiff [Bank] and did assign and deliver the same to Plaintiff with the right of Plaintiff to full recourse, unconditionally guaranteeing repayment by Dayco. Pursuant to a prior letter agreement Dayco agreed, *among other things to repurchase said Note in the event of default by Hardman.*"[4] (Italics added.)

---

[4]By letter dated December 22, 1970, from Dayco to Bank, it appears that Dayco supervised and financed this litigation for Bank in all respects and indemnified Bank in respect of any consequences of attachment. Bank agreed not to settle the case without the consent of Dayco.

The agreement between Bank and Dayco provided that in the event of a default on Note Dayco would repurchase it from Bank. On the day before default Bank was told the installment due on December 15 would not be paid. Bank did not require Dayco to buy back Note. Instead Bank filed this action, not by its attorneys but through attorneys for Dayco. Bank first consulted Dayco's attorneys in Michigan

Pragmatically the controversy reflected in this action, and it appears to be so conceded, is between Dayco and Macrodyne.

### Hardman's Neutral Existence Under Sale Contract

In our opinion, although Hardman was and is a separate corporate entity, the undisputed evidence and Sale Contract show, contrary to the express statements and the implication of Findings 9, 10 and 11 that as between the signatories to Sale Contract, Note was an intrinsic part of Sale Contract, an essential part of the consideration paid by buyer, and was intended by all of the signatories to be the obligation of Macrodyne which, through its subsidiary Chatillon, was effectively the purchaser of Dayco's subsidiary Hardman. Dayco and Macrodyne looked only to each other for performance in all respects of all the terms of Sale Contract and Note.

We are satisfied the preceding generalized factual summary of the transaction as demonstrated by Sale Contract and the undisputed record is sound.

### Interpretation of Sale Contract

"We begin our discussion with a statement of the applicable principles of appellate review. As set forth in *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [citation], it is 'a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.' The possibility that conflicting inferences can be drawn from uncontroverted evidence does not relieve the appellate court of its duty independently to interpret the instrument; it is only when

---

who were familiar with the action for rescission. Bank also retained in California lawyers who were unknown to it, but who were attorneys for Dayco and who were privy to Sale Contract and negotiation which preceded its execution and who were also familiar with the claimed misrepresentations and contractual infirmities. Attorneys' fees, bond and cost of attachment and other legal expenses were procured and paid for by Dayco.

Though Dayco had deposited with Bank, initially $500,000, and then an additional $180,000, which constituted more than adequate security for the payment of the first installment of $100,000, with accrued interest, Bank ignored such security and instead proceeded against Hardman. Bank knew of the problems concerning Note and Hardman's defenses at least a week or 10 days before the action was commenced. The complaint, prepared by Dayco's attorneys, was approved by Bank five days before the $100,000 installment became due and six days before the purported acceleration. Bank's lawyer, Jason Honigman, who enjoyed the dual role of general counsel and a director of Dayco, had actual knowledge and notice of the alleged claims and defenses of Dayco prior to the alleged purchase of Note by Bank and prior to the filing by Bank of the action at bench. Finally, Bank admitted it did not in the management of its usual loans proceed as it did at bench.

the issue turns upon the credibility of extrinsic evidence, or requires resolution of a conflict in that evidence, that the trial court determination is binding. (*Parsons* v. *Bristol Development Co.*, 62 Cal.2d at p. 866, fn. 2.)" (*Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385]; *Keane* v. *Smith* (1971) 4 Cal.3d 932, 939 [95 Cal.Rptr. 197, 485 P.2d 261]; *Pierpont Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282, 294 [74 Cal.Rptr. 521, 449 P.2d 737]; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 et seq. [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

The record at bench in respect of Sale Contract discloses no conflict in the extrinsic evidence, and no issues of credibility. It is our function to arrive at an independent interpretation of Sale Contract.

■■■ The undisputed sequence of events winnowed from copious testimony, numerous exhibits, protracted proceedings and arguments in the trial court and voluminous briefs, convinces us that Note was at Dayco's request and with Macrodyne's consent, both parties using Hardman as an agent substituted as a convenience to Dayco for what normally would have been Chatillon's note guaranteed by Macrodyne and that Dayco looked to Macrodyne for and Macrodyne expected to make payment of Note precisely as if a similar note had been made by Chatillon.

Hardman, although in all respects a separate, active and operating corporate entity, except for its use as a mutual agent of Dayco and Macrodyne to arrange certain advantages to Dayco, was intended to be and was dealt with by the parties to Sale Contract in all aspects of its corporate makeup as inert merchandise, physically transferred from seller to buyer. Hardman was not a party to Sale Contract; had no part, even remotely, in the negotiations for or in any of the events which occurred after execution of Sale Contract and participated in its consummation only as an agent of Dayco, its parent, and Macrodyne, its parent next in line, for the sole purpose of substituting Note to represent Macrodyne's deferred payment which Dayco had contracted to receive and Macrodyne expected to make. Dayco did not look upon Hardman as a party to Sale Contract and never intended to hold Hardman for any breaches thereof or to collect the deferred payment from Hardman, but looked to Macrodyne for payment of Note and performance of Sale Contract in all respects. Dayco had full knowledge that Hardman was not the true party in interest in the action at bench, that Note was executed by Hardman

as Macrodyne's agent, and as a conduit to assist Dayco and Macrodyne to consummate their deal.[5]

It is fair to assume that Dayco was fully aware as early as June 1970 when it first appears that Dayco desired to discount Note and that the deferred payment might be in jeopardy, that if payment on Note were not made on December 15, 1970, and Dayco sued thereon, it would be met with defenses already asserted. Thereupon Dayco commenced its negotia-

---

[5]Hardman, asserting it acted for Dayco or Chatillon, vigorously argued its corporate entity should be disregarded, and under the theory of *alter ego* in the trial court asserted that to fail to do so would perpetrate a fraud. (*Arnold v. Browne* (1972) 27 Cal.App.3d 386, 393 [103 Cal.Rptr. 775].)

Although in the normal *alter ego* situation a corporate entity resists the piercing of its veil, the party seeking to do so is usually a creditor who urges the court to pierce the veil in the interests of justice. (See e.g., *Talbot v. Fresno-Pacific Corp.* (1960) 181 Cal.App.2d 425 [5 Cal.Rptr. 361]; *Riddle v. Leuschner* (1959) 51 Cal. 2d 574 [335 P.2d 107]; see also *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825 [26 Cal.Rptr. 806] and cases cited therein.) A noted commentator states that the fiction of corporate entity may be and should be disregarded in the interests of justice to prevent fraud. (Fletcher, Cyclopedia of the Law of Corporations (rev. ed. 1963) § 25, pp. 97-98.) Respectable authority is to the same effect. In *Phoenix Safety Inv. Co. v. James* (1925) 28 Ariz. 514 [237 P. 958] the court disregarded the corporate entity in a case where a corporation was being used to sue a defendant in an effort to cut off defenses that would have been available against the real plaintiff. At bench this was precisely the objective of Dayco. The same result should follow when an individual uses the existence of a corporate entity as part of a scheme to perpetrate a fraud. (*In A. T. Brod & Company v. Perlow* (2d Cir. 1967) 375 F.2d 393 the court stated: "Novel or atypical methods should not provide immunity from the securities laws." (375 F.2d at p. 397). (See also *Vine v. Beneficial Finance Company* (2d Cir. 1967) 374 F.2d 627.) In *Leasco Data Processing Equipment Corp. v. Maxwell* (2d Cir. 1972) 468 F.2d 1326 the court was faced with a situation where a foreign corporation had in violation of Rule 10b-5 of the Securities Exchange Act of 1934 (17 C.F.R. § 240.10b-5) conspired to cause the plaintiff to buy stock in a corporation owned by one of the defendants. However, as part of the conspiracy they had arranged to have a foreign corporation owned by plaintiff do the actual purchasing of the stock. The court in holding that section 10b (15 U.S.C.A. § 978j(b)) did apply stated: "But even if Leasco N.V. is the beneficial owner, it would be elevating form over substance to hold that this entails a conclusion that the purchases did not have a sufficient effect in the United States to make §10b apply.

"*Whether Leasco N.V. is merely a financial conduit, as plaintiffs assert, or was planned to conduct an active business, as some of the SEC filings indicate, it was wholly-owned and its debt securities were guaranteed by Leasco and were convertible with Leasco common stock.*" (468 F.2d at p. 1338.) (Italics added.) (See also *Crane Company v. Westinghouse Air Brake Company* (2d Cir. 1969) 419 F.2d 787, *Arnold v. Browne* (1972) 27 Cal.App.3d 386, 393 et seq. [103 Cal.Rptr. 771].)

Although under the general rules referred to in *Browne* and the other cases cited in this footnote, it is settled in a variety of situations that courts will ignore form and look to substance and will not permit subterfuge to be the means of perpetrating a fraud, we feel that at bench the intention of the parties is so clear from Sale Contract and the undisputed evidence that judicial declaration of such intention should be decreed under the rule enunciated by *Parsons* and its progeny.

tions to allegedly sell Note to Bank and when negotiations between Dayco and Macrodyne to settle their differences failed to jell, Bank brought this action. The action was on the theory that Bank was for a valuable consideration the holder of a negotiable instrument in due course. The trial court, although it could have concluded from an avalanche of undisputed evidence that Bank had full notice of what had been and was transpiring between Dayco and Macrodyne and that Note was not a negotiable instrument, found it was not negotiable because it was uncertain in violation of sections 3104, 3106 of the California Uniform Commercial Code. In this litigation Bank is in the shoes of Dayco.

Dayco's recognition that deferred payment represented by Note was a substantial part of the consideration for the Hardman stock and Dayco's intention that Macrodyne should have the primary obligation to meet the deferred payment and Macrodyne's intention to pay it is demonstrated by Dayco's admissions and the record.

### 1. *Documentary Evidence of Intent*

As early as June 8, 1970, when Dayco commenced its negotiations with Bank for the alleged discount of Note to Bank, the original intention of the parties to Sale Contract that Note was Macrodyne's and not Hardman's is reaffirmed by the following pertinent excerpt from the first letter between Dayco and Bank on the subject:

"Mr. Stanford C. Stoddard, President
Michigan Bank National Association
Guardian Building
Detroit, Michigan 48226

"Dear Mr. Stoddard:

"Referencing your telephone conversation with Mr. R. J. Jacob, I am attaching additional information on Dayco's $2.75 million, prime rate, five-year installment note *due from Macrodyne Chatillon* (AMEX) . . ." (Italics added.)

The reference in the above excerpted communication to the "five-year . . . note from Macrodyne . . ." was subsequently confirmed by Dayco in its *loan* application to Bank.

Further verification that Dayco and Macrodyne assumed and intended to look to each other in all respects as to their rights and obligations under Sale Contract is contained in Dayco's 65th Annual Report for years

ended October 31st 1970, approved on January 21, 1971 (five weeks after Bank commenced action against Hardman on Note), signed respectively by its chairman of the board and president and approved by the board of directors, issued to its stockholders and introduced in evidence as Exhibit T. We quote therefrom in pertinent part:

"During the year, two subsidiaries were sold and a division was liquidated which in the aggregate accounted for approximately 6% of the Corporations 1969 sales.

"In connection with the sale in December, 1969, of one of the subsidiaries, Hardman Aerospace, the Corporation received $6 million in cash *and* an installment note receivable (discounted with a bank) for $2.75 million. The *purchaser has not made the initial payment due on the note*. Further, the *purchaser* has filed suit to rescind the sale and/or purchaser seeks damages against the Corporation. Management of the Corporation and its General Counsel are of the opinion that there is no basis for the claims made by the *purchaser* against the Corporation. The Corporation intends to defend the case vigorously." (Italics added.)

Exhibit T makes it abundantly clear that purchaser Macrodyne, from which it received $6 million in cash *and* an installment note, did not meet the first installment on Note and that *Macrodyne was the purchaser* to whom Dayco looked for payment.

Exhibit M, the MEMORANDUM OF CLOSING, is further evidence of the intention of the parties. Counsel for the named parties to Sale Contract are noted as present: resolutions of Dayco authorizing execution of Sale Contract and opinion of counsel for Macrodyne had conformed with its provisions; it itemizes delivery by Hardman to Dayco of Note ". . . pursuant to Sec. 5.1(f)(1) of the Agreement," but nowhere in the memo is it mentioned that Hardman by resolution as a separate corporate entity authorized the making of Note, nor does the memo show a delivery of such a resolution. The futility of any such resolution from Hardman in connection with the transaction, if there was one, is also significantly illustrated by the closing record which shows that as a consequence of further bargaining between Dayco and Macrodyne, the deferred payment originally agreed to be $3 million, was reduced at the closing to $2,750,000. Demonstration that Hardman was being used by Dayco and Macrodyne as the mutual agent or conduit of the parties to Sale Contract came when Dayco's counsel with the consent of Macrodyne's counsel eliminated the first page of Note and had it rewritten for $2,750,000 its final face value and restapled the rewritten page to the other pages of Note. Closing of the deal followed.

2, *Conduct of Dayco and Macrodyne Shows Hardman Not a Real Party.*

It has been noted that discussions were had between Dayco and Macrodyne which commenced in the summer of 1970 in respect of a discount of Note by Dayco and Macrodyne's assertions of defects in Sale Contract. These discussions continued until December 7, 1970. Nowhere in the record is there any evidence that Dayco ever contacted anyone at Hardman in respect of its purpose to discount Note, nor is there any indication that Hardman was looked to by Dayco for payment. Even after negotiations were broken off between Dayco and Macrodyne on December 7th, it is clear that Hardman did not remotely suspect that Dayco looked to it for payment until by slow mail, originating in Michigan, Hardman received a notice from Bank on December 14th which was dated December 9th.

It would appear that not until December 7th did Dayco *seriously* consider the legal possibility of holding Hardman as a separate entity severally liable on Note on the theory it was a negotiable instrument divorced from Sale Contract and proceed through Bank against Hardman on the theory that Bank was an innocent holder in due course and thus attempt to defuse and abort any defenses that Macrodyne had already announced if Dayco had brought the action on Note against Macrodyne or Chatillon. Ironically, the trial court found Note was not negotiable and that it was assigned to Bank. Such defenses would therefore have been valid even if Bank were a bona fide buyer of Note, were it not for Finding 10.

It is clear, too, from Sale Contract that Dayco would not have executed it, if it had not received a substantial cash payment and genuine security for deferred payment, not only in the form of a claim on the assets sold but on all the assets of the Buyer and its guarantor parent with which Hardman's assets merged.

Macrodyne was ostensibly a much more substantial entity that Hardman, when it absorbed that corporation, but even if it were not, it flies in the face of cold business judgment for a creditor with a substantial claim to proceed against only a fragment of its debtor's assets when it clearly may proceed against all the assets of such debtor, especially so when the action brought is for the whole of the deferred payment against which on Dayco's theory, no defenses could be urged.

The only other explanation is to assume that Dayco when it executed Sale Contract looked upon Note as no consideration from Macrodyne, but as an independent obligation of Hardman in the form of a negotiable

note and not as the deferred payment it expected to collect from Macrodyne. Such an assumption is not only contrary to its actions and statements before and after execution of Sale Contract, but is pregnant with the charge that Dayco had with calculation invited Macrodyne to cooperate with it in the transfer of a subsidiary from one to the other, not to achieve tax or other business advantage, but as a shield which Dayco could use to eliminate any proper claims Macrodyne might have under Sale Contract if Dayco brought suit on Note alone.

It is most difficult, too, to believe that Macrodyne, if it had the remotest suspicion that the collection of Note was anything other than the collection of the deferred payment and that Dayco could sell Note as a negotiable instrument, leaving Macrodyne without defenses against its collection or if in the months of settlement negotiations any such suggestion had been made, that Macrodyne would have defaulted on the first installment of $100,000 and interest due December 15, 1970, and invited action on Note accelerated as to principal, accured interest, costs and attorneys' fees in a sum of approximately $3 million.

### 3. *The Warranties in Sale Contract*

Wholly aside from the extrinsic evidence of showing what the parties to Sale Contract intended, of which we have set forth a few pertinent particulars, and aside from the inherent business logic of the situation, Sale Contract is fulsome with warranties. In respect of enforcement of these warranties it says in pertinent part: "Notwithstanding the foregoing, Seller shall not be obligated for any breach of any representation, warranty, term, covenant or condition hereof unless notice of claim with respect thereto is given to Seller prior to December 31, 1970, except for claims under 1.1(f) hereof, *for which there shall be no time limit.*" (Italics added.) (8.1).

The record makes clear that Dayco had notice of claims being made by Macrodyne and that the infirmities and misrepresentations of Sale Contract discussed between Dayco and Macrodyne commencing in the summer of 1970 and ending on December 7, 1970, had been registered prior to the contractually fixed statute of limitations.

It is fair to assume that Dayco made the numerous representations and warranties in Sale Contract because it believed them to be true and accurate and it is fair to assume that no contract would have been made if Macrodyne had not believed and accepted them.

It is fair to assume that neither party intended that Dayco at its

option upon the expiration of one year, by this action on Note could jeopardize the $6 million cash portion of purchase price paid by Macrodyne and reduce it to the extent of $3 million and concurrently by such action immunize itself against the warranties and representations made in Sale Contract; irrespective of whether such representations and warranties were solid or reckless and irrespective of the extent to which lack of accuracy in the warranties and/or representations may have affected the value of the consideration passing from Dayco to Macrodyne.

The importance of the warranty section of Sale Contract is emphasized by the fact that the signatories to Sale Contract knew that inaccuracies in all of the representations and warranties could not be discovered before the expiration of one year from the date of execution. For this reason special provision for at least one exception to the contractual statute of limitations was made. Thus, the excerpt quoted above extends the one-year statute of limitations ad infinitum, and states "except for claims under 1.1(f) hereof, for which *there shall be no time limit.*" (Italics added.)

Section 1.1(f) deals with representations and warranties re tax returns of Hardman made prior to Sale Contract, the makeup and payment of the same; warranties that Hardman is not liable contingently or otherwise; makes provisions for possible recalculations; deficiencies and refunds and says in pertinent part: "Notwithstanding the foregoing, but without limiting the effect thereof, it is understood that Buyer may dissolve Corporation [Hardman] for the purpose of adjusting the cost basis of the assets of Corporation pursuant to Section 334(b)(2) of the Internal Revenue Code of 1954, as amended. The allocation of the purchase price payable by Buyer hereunder among the assets acquired on such dissolution shall be made in the sole and absolute discretion of Buyer, but any such allocation, whether it results in an increase or decrease in the cost basis of such assets to Corporation prior to its dissolution, shall not, in and of itself, constitute a breach of or evidence of any breach of any representation or warranty of Seller that is contained herein."

Nothing in the conduct of Dayco in the negotiations leading to or in its execution of Sale Contract suggests an intent on Dayco's part to eliminate or attenuate proper claims that might arise in Macrodyne's favor against it and nothing in the conduct of Macrodyne remotely indicates that it suspected Dayco of any intent which remotely suggested that the representations and warranties applied to but two-thirds of the value of the Hardman stock.

## ARGUMENT

The manner in which Note was accelerated and with which Bank brought an action against Hardman to the exclusion of its known principal Macrodyne and its use of the remedy of attachment for the full principal of Note against Hardman, impels one to the conclusion that Dayco seized upon the subterfuge of using what would appear to be a good faith third party holder of Note as plaintiff in an all out effort to force a settlement on its terms and thus avoid making any answer or defense to the alleged infirmities of Sale Contract raised by Macrodyne.

We express no opinion upon the soundness or validity of the claims Macrodyne asserts against Dayco in the New York rescission action which we assume are reasonable facsimiles of the defenses Hardman sought to interpose to collection of Note. We are satisfied, however, that as between the parties to Sale Contract, Hardman was a known disclosed agent of Macrodyne and should not have been forced to stand suit for a deferred payment which Dayco knew was the obligation of Macrodyne, and nothing in this opinion is intended to suggest that Macrodyne is not responsible for the deferred payment represented by Note subject to such defenses, counterclaims and offsets as it may be able to prove.

The judgment in favor of Michigan National Bank against Hardman Aerospace is vacated and the trial court is directed to enter a judgment in favor of Hardman Aerospace and against Michigan National Bank for its costs.

Compton, J., and Beach, J., concurred.

A petition for a rehearing was denied January 15, 1974, and respondent's petition for a hearing by the Supreme Court was denied April 10, 1974.